## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARK WHALING,** | : | |
| | : | |
| *Plaintiff* | : | |
| | : | |
| v. | : | No. 1:08-cv-210 |
| | : | |
| **ERIE COUNTY PRISON, et al.,** | : | |
| | : | |
| *Defendants* | : | JURY TRIAL DEMANDED |

## MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

AND NOW, come the Defendants, Erie County Prison, James Veshecco, Shawn Wilson, Mark Olowin, Joey Aganello, Eugene Ricci, Brian Ames, Craig Owens, Adam Johnson, Edward Yeaney, Robert Kremenik, Leslie Danowski, Thomas Loftus, Andrew Parks, and Willie Damper, by and through their attorneys, Marshall, Dennehey, Warner, Coleman & Goggin and Patrick M. Carey, Esquire, and support of the instant Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6), aver as follows:

## I.    PROCEDURAL HISTORY

1.    Plaintiff commenced this action by the filing of a Complaint on or about July 24, 2008 alleging various civil rights and other violations and naming as Defendants the Erie County Prison, James Veshecco, Shawn Wilson, Mark Olowin, Joey Aganello, Officer Ricci, and "all the John Doe Officers of the Prison Emergency Response Team."

2.    The above-referenced Defendants filed a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) [Document #13] on or about January 8, 2009.

3.    Plaintiff was granted leave to file an Amended Complaint and thereafter filed his First Amended Complaint [Document #20] on or about March 30, 2009.

4.     In his First Amended Complaint, Whaling names Brian Ames, Craig Owens, Adam Johnson, Edward Yeancy, Robert Kremenik, Thomas Loftus, Andrew Parks, Eugene Ricci, Leslie Danowski and Willie Damper as Defendants.

5.     A Motion to Dismiss was filed by Co-defendants, Nurse Hillkirk and Patty "Doe", on or about April 30, 2009.

## II.    FACTS ALLEGED AND CLAIMS RAISED BY THE PLAINTIFF

6.     Plaintiff is currently confined at the State Correctional Institution at Frackville serving a sentence of 7 ½ - 25 years incarceration. (See Plaintiff's Original Complaint.)

7.     On or about July 3, 2006, the Plaintiff, while an inmate at SCI Houtzdale, allegedly suffered a heart attack. (See Amended Complaint, ¶ 9.)

8.     Plaintiff alleges that in July of 2006, he was transferred from SCI Houtzdale to the Erie County Prison for purposes of a re-sentencing hearing. (See Plaintiff's Amended Complaint, ¶ 10.)

9.     Plaintiff contends that when he was committed to the Erie County Prison, he was placed in the B-Unit/Medical Unit because of chest pains. (See Plaintiff's Amended Complaint, ¶ 11.)

10.     Plaintiff was later reclassified and moved to general population. (See Plaintiff's Amended Complaint, ¶ 12.)

11.     Plaintiff contends that when he was shipped to the Erie County Prison from SCI Houtzdale, he was not provided with a sufficient amount of his medication and, therefore, was receiving partial doses of his medication while an inmate in the Erie County Prison. (See Plaintiff's Amended Complaint, ¶ 14.)

12.    Plaintiff admits that he was offered generic medicine by the Erie County Prison medical staff but he refused it. (See Plaintiff's Amended Complaint, ¶ 15.)

13.    Plaintiff contends that he requested a grievance form so he could complain about not receiving his required medicine; however, he was told by a prison counselor (Willie Damper) that this was not a grievable issue and consequently not provided a grievance form. (See Plaintiff's Amended Complaint, ¶ 16.)

14.    Plaintiff avers that he had a conversation with Sergeant Olowin who agreed with the prison counselor that this was not a grievable issue. (See Plaintiff's Amended Complaint, ¶¶ 17 and 18.)

15.    When Plaintiff was told by Counselor Damper and Sergeant Olowin that he was not permitted to grieve the issue of the adequacy of his medical care, Plaintiff claims that he "insisted that he wanted to exercise his right to file a grievance" and that in response, Sergeant Olowin became "agitated, verbally aggressive, and confrontational" and ordered Whaling to pack his belongings to be transferred to the maximum housing unit. (See Plaintiff's Amended Complaint, ¶ 19.)[1]

16.    Whaling alleges that after the verbal exchange with Sergeant Olowin, Whaling was handcuffed by Olowin enroute to protective custody. Whaling also alleges that Olowin physically assaulted him enroute to protective custody by "dragging, punching and slamming the Plaintiff against the wall causing him to hit his head." (See Plaintiff's Amended Complaint, ¶ 22.)

---

[1]  In Plaintiff's Original Complaint, ¶ 18, he admitted that when Sergeant Olowin agreed with the prison counselor that this was not a grievable issue, Whaling "got stern and voiced his opinion."

17.   Plaintiff contends that after telling Sergeant Olowin that he (Olowin) would be hearing from the Plaintiff's lawyer, Sergeant Olowin summoned an extraction team to remove Plaintiff from his cell and take him to an isolation room in the gymnasium where he was strip searched. (See Plaintiff's Amended Complaint, ¶¶ 23 and 24.)

18.   Plaintiff alleges that Correctional Officers, Brian Ames, Craig Owens, Adam Johnson, Edward Yeaney, Robert Kremenik, Leslie Danowski, and Thomas Loftus, made up the members of the Erie County Prison Cell Extraction and Emergency Response Team. (See Plaintiff's Amended Complaint, ¶¶ 4 and 24.)

19.   According to Whaling, Sergeant Olowin ordered the extraction team to escort Whaling to the gymnasium where he was strip searched. (See Plaintiff's Amended Complaint, ¶¶ 25 and 26.)

20.   Whaling next alleges that he was "wrestled by excessive force inflicted by the Cell Extraction Team, nearly breaking the Plaintiff's arm handcuffing him without any resistance on behalf of the Plaintiff who was totally nude." (See Plaintiff's Amended Complaint, ¶ 27.)

21.   Whaling then claims that Sergeant Olowin ordered the extraction team to place Whaling in the restraint chair at which time "the Defendants" used a protective shield in a "slamming like motion" to force Whaling into the restraint chair. (See Plaintiff's Amended Complaint, ¶ 28.)

22.   Plaintiff alleges that the "Defendants" strapped and cuffed him into the restraint chair in such a manner that the restraints cut off the circulation through his arms and legs. Whaling further claims that when he was wheeled into the isolation room face forward, his left hand was "forcibly injured" because the restraint chair barely cleared the entrance of the doorway. (See Plaintiff's Amended Complaint, ¶ 29.)

23.     Whaling alleges that he was left in the restraint chair for approximately 8 hours during which time he was "periodically taunted, physically and mentally abused by Defendants Shawn Wilson, Eugene Ricci, and numerous other officers." (See Plaintiff's Amended Complaint, ¶ 30.)

24.     After 15 ½ hours in the restraint chair, Whaling was allegedly taken by Defendant Aganello into the intake unit which was kept an "ice cold" temperature to await the Erie County Sheriff's arrival to transport Whaling back to SCI Houtzdale.  (See Plaintiff's Amended Complaint, ¶ 31.)

25.     Whaling also alleges that during the 15 ½ hours he was in the restraint chair, he was "mentally and physical (sic) abused, threatened, and at no time was the Plaintiff feed (sic), given his prescribed medication, allowed to use the bathroom (sic)." (See Plaintiff's Amended Complaint, ¶ 32.)

26.     Based upon the foregoing, Mr. Whaling makes the following claims:

        a.     An Eighth Amendment violation based upon "deliberate denial of medical care;"

        b.     An Eighth Amendment violation based upon "physical brutality and misuse of excessive force;"

        c.     An Eighth Amendment violation based upon "cruel and unusual punishment;"

        d.     First and Eighth Amendment violations based upon "punitive retaliation for wanting to exercise the right to file a grievance;"

        e.     A violation of the Fourteenth Amendment;

        f.     Intentional infliction of emotional and mental distress; and

      g.      Assault and battery.

    27.    Plaintiff has demanded compensatory and punitive damages against each

Defendant.

## III.   EXHIBITS RELIED UPON BY DEFENDANTS IN SUPPORT OF THEIR MOTION TO DISMISS

    28.    The Defendants attached the following exhibits to their original Motion to

Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) [Document #13] and the

Defendants incorporate by reference each and every one of those exhibits as if attached hereto.[2]

The exhibits attached to the Defendants' Original Motion to Dismiss are:

    a.      Affidavit of Deputy Warden James Senyo, authenticating the following

documents (Exhibit A);

    b.      Prison documents regarding the transfer of Mark Whaling to the Erie

County Prison on July 13, 2006 and his discharge/transfer to SCI Houtzdale on July 27, 2006 (2

pages) (Exhibit B);

    c.      Misconduct Report of Sergeant Mark Olowin dated July 26, 2006 (1

page) (Exhibit C);

    d.      Misconduct Report of Correctional Officer Andrew Parks dated July 26,

2006 (1 page) (Exhibit D);

    e.      Information Reports from Correctional Officer Brian Ames dated July 26,

2006 (1 page), Corporal Robert Kremenik dated July 26, 2006 (1 page), Correctional Officer

Adam Johnston dated July 26, 2006 (1 page), Correctional Officer Edward Yeaney dated July

26, 2006 (1 page), Correctional Officer Shawn Wilson dated July 26, 2006 (1 page), Correctional

---

[2]  In considering a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court may consider extraneous materials outside of the Complaint and, thereafter, the Motion will be treated as a Motion for Summary Judgment and disposed of as provided in Rule 56. Federal Rule of Civil Procedure, Advisory Committee Notes.

Officer Thomas Loftus dated July 26, 2006 (1 page), and Correctional Officer Craig Owen dated July 26, 2006 (1 page) (total of 6 pages) (Exhibit E);

      f.        A DVD video of the extraction of Mark Whaling, his placement into the restraint chair, and a portion of the time he spent in the restraint chair, dated July 26-July 17, 2006 (the DVD will be hand delivered to the Clerk of Courts Office and a copy mailed to the Plaintiff and Co-defendants) (Exhibit F);

      g.        Commonwealth of Pennsylvania Department of Corrections, Report of Extraordinary Occurrence authored by Sergeant Mark Olowin (2 pages) (Exhibit G);

      h.        Pertinent portions of the Erie County Prison Inmate Handbook(pages 16-19) regarding Classification of inmates, Security and Control, and use of the isolation room and restraint chair (3 pages) (Exhibit H);

      i.        Restraint Chair Log for Mark Whaling dated July 26, 2006 beginning at 4:40 p.m. through July 27, 2006 at 8:10 a.m. (9 pages) (Exhibit I);

      j.        Misconduct Report of Correctional Officer Shawn Wilson dated July 26, 2006 (1 page), Information Report of Correctional Officer Eugene Ricci dated July 26, 2006 (1 page), Information Report of Correctional Officer John Kendziora dated July 27, 2006 (1 page), Misconduct Report of Correctional Officer Joseph Iannello dated July 27, 2006 (1 page), Information Report of Captain Robert Kalivoda dated July 27, 2006 (1 page), and Information Report of Correctional Officer Douglas Patterson dated July 27, 2006 (1 page) (Exhibit J);

      k.        A General Investigative Report of Pennsylvania State Police Trooper Mary Jane McGinnis dated July 30, 2006 (3 pages) (Exhibit K);

      l.        A Report of Erie County Deputy Sheriff Chris Campanelli (1 page) (Exhibit L);

m.     Erie County Prison nurse's notes regarding the care and treatment of

Mark Whaling for the dates of July 13, 2006 through July 27, 2006 (3 pages) (Exhibit M); and

n.     Doctor's orders and progress notes for Mark Whaling regarding his

medical care and treatment in the Erie County Prison between July 13, 2006 and July 27, 2006 (4

pages) (Exhibit N).

## IV.   DEFENDANTS' STATEMENT OF FACTS BASED UPON EXHIBITS ATTACHED TO THE ORIGINAL MOTION TO DISMISS

29.     The following is a statement of facts based upon the exhibits relied upon by the

Defendants:

a.     Plaintiff, Mark Whaling, was an inmate at SCI Houtzdale, serving a

sentence of 7 ½ - 25 years and was transported to the Erie County Prison on July 13, 2006 for

purposes of a Court hearing.  (See Plaintiff's Complaint, see Defendants' Exhibits A and B.)

b.     Mark Whaling was upset because he was allegedly shipped from SCI

Houtzdale to the Erie County Prison without a sufficient supply of his prescribed medications.

(See Exhibit C.)

c.     Upon his admission to the Erie County Prison on July 13, 2006, Plaintiff's

medical condition(s) and medications were reviewed and assessed by the nurse and doctor in the

prison.  (See Defendants' Exhibits M and N.)

d.     After his admission to the Erie County Prison, Plaintiff's medical

condition(s) and/or medications were addressed by prison nurses and/or doctors on July 17,

2006, July 18, 2006, July 20, 2006, July 21, 2006, July 24, 2006, July 26, 2006 and July 27,

2006.  (See Defendants' Exhibits M and N.)

e.     Whaling was prescribed Zantac by the doctor at the Erie County Prison

but he refused to take that medication because he wanted to take Prilosec, which apparently had

-8-

been prescribed to him by the prison doctor at SCI Houtzdale. (See Plaintiff's Complaint, see Defendants' Exhibit C, M and N.)

        f.      Per Erie County Prison protocol, the prison doctor prescribed Zantac for the Plaintiff and if that did not adequately treat his condition, Mr. Whaling could have submitted a medical request slip and be examined by the prison doctor. (See Defendants' Exhibit C.)

        g.      On or about July 26, 2006, the Plaintiff expressed his displeasure with Prison Counselor Willie Damper about the fact that the prison had prescribed Zantac for him rather than provide him with Prilosec as prescribed by the prison doctor at SCI Houtzdale. (See Defendants' Exhibit C.)

        h.      In turn, Prison Counselor Willie Damper contacted Sergeant Mark Olowin regarding Whaling's concerns. (See Defendants' Exhibit C.)

        i.      Plaintiff told Counselor Damper that he (Whaling) had submitted several medical request slips to the prison nurse/doctor regarding the fact that Zantac was not working and that he wanted a prescription for Prilosec. However, when Sergeant Olowin checked with the prison nurse regarding this claim, he was informed that Mr. Whaling had, in fact, not submitted any medical requests regarding this issue. (See Defendants' Exhibit C.)

        j.      In response, Sergeant Olowin, Corporal Kremenik, and Counselor Damper spoke with the Plaintiff and asked him if he had submitted a medical request slip to which the Plaintiff responded, "NO I DON'T HAVE TO." (See Defendants' Exhibit C.)

        k.      When Sergeant Olowin explained to the Plaintiff that he would have to submit a medical request slip in order to remedy the situation, Mr. Whaling became belligerent stating, "I'M NOT GOING TO. I'LL JUST PUT IN A GRIEVANCE." (See Defendants' Exhibit C.)

l.       When Sergeant Olowin advised the Plaintiff that he would not be able to grieve this issue since the Plaintiff did not follow the proper prison procedure (submitting a medical request slip), the Plaintiff responded with words to the effect of "Oh I'll get one. I'm an inmate. I have rights. I'm going to sue whoever I have to. I've got Attorney Lenny Ambrose. You're done. I'll get a grievance and grieve you." (See Defendants' Exhibit C.)

m.      Based upon Whaling's belligerent attitude, Sergeant Olowin ordered him to return to his cell and pack his belongings because he was going to be moved to FF-Pod. (See Defendants' Exhibit C.)

n.      In response, Whaling stated words to the effect of "Whatever, I'm going to sue everyone." (See Defendants' Exhibit C.)

o.      Whaling packed his belongings and when he was being escorted by Sergeant Olowin and Corporal Kremenik to FF-Pod, Whaling became irritated and dropped his bin of belongings on the hallway floor. He then threw his hands up stating words to the effect of "You might as well take me to the hole (RHU Protective Unit) for protection." Whaling was also waving his arms around in an aggressive manner. (See Defendants' Exhibits C and G.)

p.      Whaling was then handcuffed and taken to cell EE-2#9. At that time, Whaling proclaimed that he was not going to eat or drink anything or take his medication. He again threatened to sue everyone from the prison involved with him. (See Defendants' Exhibits C and G.)

q.      After Whaling was placed in a cell in the EE Block, he began yelling and punching the walls, bed and window of his cell. He also told Correctional Officer Andrew Parks that he intended to kill him if he ever had the opportunity. Whaling also threatened, "I AM GOING TO KILL EVERYONE HERE THAT EVER FUCKED WITH ME." Sergeant Olowin

was summoned to the EE-Pod to assess Whaling's behavior. Upon Olowin's arrival, Whaling began to yell profanities at Olowin while punching and pounding the window of his cell. Whaling also threatened to kill Sergeant Olowin and threatened to kill anyone who entered his cell. (See Defendants' Exhibit D.)

       r.    Whaling's behavior was not only aggressive and threatening, it was disruptive to the entire cell block and to prison officials.

       s.    Sergeant Olowin notified his superior officers as well as the prison mental health and medical professionals about Whaling's behavior and the comments he made. Olowin was then notified by Correctional Officer Parks that Whaling was screaming, threatening prison staff and punching his cell door. In response, Olowin ordered an extraction team to report to the restricted housing unit (RHU). When Olowin arrived, he found psychiatric nurse specialist (Patty) present and monitoring the Plaintiff's behavior. (See Defendants' Exhibit G.)

       t.    When Olowin approached the Plaintiff, Whaling again threatened to kill Olowin and his family and then began punching at the cell door. Whaling also threatened to kill every member of the extraction team if they entered his cell. (See Defendants' Exhibit G.)

       u.    When the extraction team approached the Plaintiff's cell, Whaling initially began to come forward with a spoon in his right hand wrapped in a towel. He was ordered to drop the spoon but did not comply. When Whaling saw that the extraction team had a pepper ball gun in their presence, Whaling complied. (See Defendants' Exhibit E, Report of Kremenik, see also Exhibit G.)

v.       Although Whaling claimed in his Complaint that during the extraction he was wrestled to the ground, nearly breaking his right arm and was slammed with a shield into a restraint chair, the Correctional Officers' reports (Exhibit E) and the videotape taken by the Erie County Prison (Exhibit F) reveal that that these allegations are blatantly false.

w.       The videotape of the Plaintiff's extraction from his cell reveals, at most, that minimal force was employed by the Erie County Prison officials during the Plaintiff's extraction. Further, the Plaintiff was never taken to the ground, did not suffer or complain of suffering any physical injuries during the process, and was gently and slowly backed into the restraint chair by a correctional officer holding a shield. (See Defendants' Exhibit F.)

x.       Plaintiff was then taken to an isolation room where a strip search was conducted. A videotape of the extraction process shows that the Plaintiff walked, without incident, from his cell to the isolation room in the prison's gymnasium. (See Defendants' Exhibit F.)

y.       While in the isolation room, Whaling's handcuffs were removed and he was strip searched. During the strip search process, Whaling became agitated, aggressive and confrontational. Prison officials were forced to give Whaling verbal commands repeatedly before he complied. (See Defendants' Exhibits E and F.)

z.       During the strip search, Whaling began striking himself in the face and head and because of his actions and non-compliance, Whaling was turned toward the wall, placed up against the wall, and handcuffed. Whaling was then backed into the restraint chair without incident. (See Defendants' Exhibits E, F and G.)

aa.       Despite Whaling's claims in his Complaint that his restraints were applied so tightly that they cut off circulation to his extremities, the videotape of Whaling's

-12-

extraction/placement in the restraint chair and the medical and other records attached hereto establish that these claims are blatantly false. In fact, Whaling's circulation was immediately checked by prison medical staff and was checked on a repeated and periodic basis by both prison correctional and medical staff. (See Defendants' Exhibits E, F, I, M and N.)

bb.     Although Whaling contends that when he and the restraint chair were wheeled into the isolation room, he struck his left hand on the doorway causing injury, the videotape clearly shows that did not occur. (See Exhibit F.)

cc.     Whaling further contends that during his time in the restraint chair, he was repeatedly and periodically taunted by prison guards, he was mentally and physically abused by them, he was placed in a "ice cold" room, he was totally nude, he was slapped around, he was not provided with any food or medication, and he did not receive any bathroom breaks. These allegations are also patently false and are refuted by the exhibits produced by the Defendants. (See Defendants' Exhibits E, F, I, J, M and N.)

dd.     The removal of Whaling from his cell and his placement in an isolation room and in the restraint chair was pursuant to and in compliance with an Erie County Prison policy as set forth in the Erie County Prison Inmate Handbook, pages 16-19. (See Defendants' Exhibit H.)

ee.     Pursuant to that policy, the Plaintiff was initially placed in an isolation room without mechanical restraints after he repeatedly failed to obey orders from correctional officers and after verbally harassing correctional officers with disrespectful and threatening language which created a disturbance. (See Defendants' Exhibit H.)

ff.    Plaintiff was then placed back in restraints and ultimately placed in the
restraint chair because of his repeated and continuous conduct that involved actual physical
violence toward himself and direct threats of violence to the entire prison staff. His placement in
restraints was for his safety and the safety of prison employees. (See Defendants' Exhibit H.)

gg.    After Whaling was placed in the restraint chair, he was constantly and
consistently monitored by prison staff who made notations on 15 minute intervals as to his
behavior. He was also checked at least every 2 hours by prison medical staff. (See Defendants'
Exhibit I.)

hh.    During the time that Plaintiff was in the restraint chair (from July 26,
2006 at 4:40 p.m. until July 27, 2006 at 8:10 a.m.), he continued to yell and scream and make
verbal threats to the prison staff. This behavior was interspersed with bizarre behavior which
included singing, rambling, and occasional periods of time when he was quiet. (See Defendants'
Exhibits I and J.)

ii.    Because of his behavior, prison staff placed a video camera in the
isolation room with the Plaintiff. Plaintiff immediately began to try to spit the camera which
then resulted in the placement of a spit shield over the Plaintiff's head. Plaintiff continued to yell
and make threats thereafter. (See Defendants' Exhibits F and J.)

jj.    During the time that Plaintiff was in the restraint chair, he refused to be
released from the restraint chair, refused food and refused medication. (See Defendants' Exhibits
I and J.)

kk.    At approximately 7:45 a.m. on July 27, 2006, the Plaintiff was removed
from the restraint chair, examined by the prison doctor, and got dressed. He was then discharged

at approximately 8:10 a.m. to the Erie County Sheriff's Department for transportation to SCI Houtzdale. (See Defendants' Exhibit I.)

   ll.  The nurse's notes and doctor's orders from Prison Health Services, the medical provider for the Erie County Prison, reveal that the Plaintiff was provided adequate medical care during his stay at the Erie County Prison. Those records also reveal that he was adequately monitored and treated during the time that he spent in the restraint chair. (See Defendants' Exhibits M and N.)

   mm.  After Plaintiff was transported to SCI Houtzdale, he made a complaint to prison officials that he was physically abused by prison staff while in the Erie County Prison. This alleged abuse was also reported by the Plaintiff's sister, Joyce Counts.

   nn.  As a result, the Pennsylvania State Police in Clearfield dispatched Trooper Mary Jane McGinnis to interview Mr. Whaling and to investigate this claim. (See Defendants' Exhibit K.)

   oo.  Whaling told Trooper McGinnis that during his strip search in the isolation room, "they (Erie County Prison staff) took me down and one of the guards said, I'm going to fucking break your arm. They put the cuffs back on and pulled me backwards into the chair. . . they pushed my neck down and pulled my hair. They kept turning the light off and on. They were saying stuff about my family and mentally torturing me for 6-8 hours." (See Defendants' Exhibit K.)

   pp.  The allegations Plaintiff made to Trooper McGinnis are blatantly false and are refuted by the videotape taken by the Erie County Prison. (See Defendants' Exhibit F.)

   qq.  Whaling also told Trooper McGinnis that when the Erie County Deputy Sheriff picked him up for transport to SCI Houtzdale, the deputy, who Whaling identified as

-15-

"Chris Capolino," told the guards, "What did you do to him, he has no circulation." (See Defendants' Exhibit K.)

          rr.     According to the report of Deputy Chris Campanelli (Exhibit L), Whaling appeared "distraught" with a blanket over his lap and a spit shield over his face. Campanelli also recalled that the Erie County Prison doctor came in and examined Whaling and noticed a lot of swelling to the Plaintiff's hands, but cleared him to be transported. Whaling then got dressed, was handcuffed, and transported by Campanelli to SCI Houtzdale without incident. (See Defendants' Exhibit L.)

          ss.     During her interview of the Plaintiff on July 30, 2006, Trooper McGinnis observed swelling in both of Whaling's hands, greater in the right hand that in the left, but did not observe any other injuries to the Plaintiff. (See Defendants' Exhibit K.)

## V.    BASIS FOR DISMISSAL OF PLAINTIFF'S CLAIMS

          30.     The Plaintiff's conclusory allegations of violations of his constitutional rights by "the Defendants" and by "the members of the Prison Cell Extraction and Emergency Response Team" are conclusory in nature, are violative of Federal Rule of Civil Procedure Rule 8, as well as the Supreme Court's recent decisions in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) and Ashcroft v. Iqbal, 556 U.S. _____ (2009).

          31.     The Plaintiff has failed to state a claim of retaliation under the First Amendment.

          32.     The Plaintiff has failed to state a claim under the Eighth Amendment for the alleged excessive use of force.

          33.     The Plaintiff has failed to state a claim under the Eighth Amendment for the alleged "cruel and unusual punishment."

34. The Plaintiff has failed to state a claim under the Eighth Amendment for the alleged "deliberate denial of medical care."

35. The Plaintiff has failed to state a claim under the Fourteenth Amendment.

36. The Plaintiff has failed to state a claim of common law assault and battery or intentional infliction of emotional distress.

37. The Plaintiff has failed to exhaust administrative remedies under the Prison Litigation Reform Act.

38. All Defendants are entitled to immunity from suit under the Qualified Immunity Doctrine.

39. All Defendants are entitled to immunity from suit regarding any state law claims under the Political Subdivision Tort Claims Act, 42 Pa.C.S. §8541 *et seq.*

40. Any state law claims involving intentional conduct are barred by the one-year statute of limitations under Pennsylvania law.

41. Warden James Veshecco is entitled to dismissal of all claims under the theory of supervisory liability.

42. The Plaintiff has failed to state a claim against Defendant Andrew Parks or Eugene Ricci.

43. The Plaintiff has failed to state a claim against Prison Counselor, Willie Damper.

44. All claims against the "Erie County Prison" should be dismissed under Monell v. Department of Social Services, 436 U.S. 658 (1978).

45. All claims against the "John Doe Officers of the Prison Emergency Response Team" should be dismissed.

46.     To the extent that the Plaintiff has failed to show the personal involvement of any of the named Defendants, said Defendants should be dismissed based upon the Plaintiff's failure to state a claim.

47.     Plaintiff's request for punitive damages must be dismissed because punitive damages are not recoverable against municipalities or their individual employees acting in their official capacities.

48.     Given the fact that the Plaintiff has filed an Original Complaint, has been provided with the Defendants' records of this incident, and has now filed an Amended Complaint in which the only substantive amendment has been the identification of the "John Doe" Defendants, any further amendment to the Plaintiff's Complaint should be deemed futile.

WHEREFORE, for the reasons set forth above, the Defendants respectfully request an Order from this Honorable Court granting the Defendants' Motion to Dismiss First Amended Complaint and dismissing the Plaintiff's claims, in their entirety, with prejudice.

Respectfully submitted,

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN

By: _____
Patrick M. Carey, Esquire
PA ID # 50171
717 State Street - Suite 701
Erie, PA  16501
(814) 480-7803

-18-

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARK WHALING,** | : | |
| | : | |
| *Plaintiff* | : | |
| | : | |
| v. | : | No. 1:08-cv-210 |
| | : | |
| | : | |
| **ERIE COUNTY PRISON, et al.,** | : | |
| | : | |
| *Defendants* | : | JURY TRIAL DEMANDED |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the within Motion to

Dismiss Plaintiff's First Amended Complaint Pursuant to Federal Rule of Civil Procedure

12(b)(6) was mailed to the following listed below this 21st day of May, 2009 by electronic

filing, courthouse box or United States First Class mail, postage pre-paid.

Mark Whaling
FW-9846
SCI-Frackville
1111 Altamont Boulevard
Frackville, PA 17931

Alan S. Gold, Esquire
GOLD & FERRANTE
261 Old York Road
Suite 526
Jenkintown, PA 19046

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN

By: _____
Patrick M. Carey, Esquire

16/166950.v1